## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

```
------------------------------x
                              :
UNITED STATES OF AMERICA,     :    Civ. No. 3:19CV01185(SALM)
ex rel. RALPH BILLINGTON,     :
MICHAEL ACEVES, and SHARON    :
DORMAN                        :
                              :
v.                            :
                              :
HCL TECHNOLOGIES LTD. and     :
HCL AMERICA, INC.             :    July 28, 2022
                              :
------------------------------x
```

### RULING ON MOTION TO DISMISS [Doc. #52]

Plaintiffs-relators Ralph Billington ("Billington"),
Michael Aceves ("Aceves"), and Sharon Dorman ("Dorman")
(collectively "plaintiffs")[1] filed this qui tam action on August
1, 2019 [Doc. #1], and have since filed four amended complaints.
See Docs. #7, #8, #19, #48. Plaintiffs now proceed pursuant to
the Fourth Amended Complaint ("4th AC"), which asserts a single
count for violation of the False Claims Act, 31 U.S.C. §§3729-
3733 ("FCA") against defendants HCL Technologies Ltd. and HCL
America, inc. (collectively "defendants" or "HCL").[2] See

---

[1] For ease of reference, the plaintiffs-relators are hereinafter
referred to as "plaintiffs."

[2] The United States declined to intervene in this action. See
Doc. #12; 31 U.S.C. §3730(b)(4)(B).

1

generally Doc. #48.[3] Plaintiffs allege that defendants have engaged in "widespread fraud against the United States in applying for and securing work visas[,]" so that defendants "can import and employ cheap labor (primarily from India) in the U.S. and avoid having to employ higher priced Americans." Id. at 1, ¶1. In relevant part, plaintiffs contend that defendants have violated the FCA by: (1) submitting fraudulent visa applications; (2) defrauding the government out of tax revenue by underpaying its H-1B visa workers; and (3) applying for less expensive visas for positions and work for which more expensive visa applications are required. See generally Doc. #48.

Defendants have filed a motion seeking to dismiss the 4th AC, along with a supporting memorandum. See Docs. #52, #53. Plaintiffs have filed a memorandum in opposition to defendants' motion to dismiss, see Doc. #57, to which defendants have filed a reply. See Doc. #63.

For the reasons stated below, defendants' Motion to Dismiss [**Doc. #52**] is **GRANTED.**

---

[3] Throughout this Ruling, the Court cites to the page numbers reflected in each document's ECF header, rather than the pagination applied by the filing party.

I.    **FACTUAL BACKGROUND**

For purposes of deciding the motion to dismiss, the Court
presumes the following factual allegations from the 4th AC [Doc.
#48] to be true.

Plaintiffs are former employees of HCL. See Doc. #48 at 3,
¶7. HCL provides information technology ("IT") services to other
American companies in lieu of those companies maintaining in-
house IT personnel. See id. at 4-5, ¶¶16-17. "HCL's work for
corporate clients is project-based, meaning a client will
contract with HCL to perform specific tasks or projects, and
HCL's employees are staffed to a client for a particular project
position." Doc. #48 at 5, ¶17.

HCL employs primarily Indian citizens in the United States
for whom HCL has obtained visas. See id. at 5, ¶19. In the IT
sector, Indian citizens earn less salary than American citizens,
and are therefore less expensive to employ. See id. By employing
people "willing to work for less, [HCL] can better compete for
corporate clients and reap larger profits." Id. at 5, ¶18.

"HCL applies for and secures three types of visas for its
foreign workforce: H1-B, L-1, and B-1 visas." Id. at 6, ¶21.
Because the differences between these visas are meaningful to
the claims in this case, the Court briefly describes each type
of visa, as alleged in the 4th AC.

A.   <u>H1-B Visas</u>

> H-1B visas are intended to bring foreign workers to the
> United States to perform services in specialty
> occupations when there are insufficient workers in the
> U.S. to perform a specific job. As part of each H-1B
> visa application, the petitioner must establish that an
> actual job at a specific location is available for the
> person for whom the company seeks the visa. H-1B visa
> petitions cannot be filed for speculative or future
> work.

<u>Id.</u> at 6, ¶22 (citations omitted). When applying for an H1-B

visa, the petitioner must submit a Labor Condition Application

("LCA") describing the foreign worker's "intended occupation and

employment location[,]" and an attestation that: "(a) the job

for which a visa is sought actually exists and (b) that [the

employer] will pay the visa holder a 'prevailing wage[,]'" that

is "at least as much as [the employer] pays American workers for

the same work in the same geography[.]" Doc. #48 at 6-7, ¶23.

"H1-B visa holders may work in the United States for a maximum

initial stay of three years, followed by another three year

extension, and then on a year-to-year basis for those visa

holders seeking permanent U.S. residency." <u>Id.</u> at 8-9, ¶28.

The United States "issues only 65,000 H1-B visas each year

(plus an additional 20,000 for individuals with graduate degrees

from American universities)." <u>Id.</u> at 8, ¶26. The United States

awards these visas through an "extremely competitive[]" "lottery

process[.]" <u>Id.</u>

4

The cost of an H1-B visa application is "$2,460 per application." Id. at 9, ¶28 (footnote omitted).

B.   L-1 Visas

"L-1 visas are intended for a substantially narrower range of work and workers than H1-B visas." Id. at 9, ¶29. There are two types of L-1 visas, the L-1A and L-1B visas, which are reserved for "management-level employees[]" and "subject matter experts[,]" respectively. Id. Detailed documentation must be provided in support of an L-1 visa. See Doc. #48 at 9, ¶30. "L-1 visa holders may work in the United States for a maximum initial stay of three years, which may be extended" for a limited period depending on whether the visa is an L-1A or L-1B. Id. at 10, ¶31.

There is no limit on the number of L-1 visas issued each year. See id. The cost of an L-1 visa application is "$1,460 per application[.]" Id.

C.   B-1 Visas

"The B-1 visa is a short-term visitor visa that allows a foreign national to temporarily enter the United states for" certain business purposes. Doc. #48 at 10, ¶32. B-1 visa holders are prohibited "from perform[ing] skilled or unskilled labor while in the United States." Id. B-1 visas cost just "$160 per application[.]" Id. at 11, ¶34.

D.   <u>The Alleged Fraudulent Scheme</u>

HCL risks losing business if it does not "have staff available to fulfill the client's service needs." <u>Id.</u> at 14-15, ¶58. Given the realities of the United States visa system, and the "pressures" to maintain its business, plaintiffs allege that "HCL has elected to engage in a vast visa fraud scheme to create a cheap foreign workforce to whom visas have been issued by the U.S. government when the purported jobs or work against which the visas were issued do not in fact exist." Doc. #48 at 15, ¶59. Plaintiffs allege that this

> scheme includes three types of fraud: (i) failing to pay H-1B visa recipients required salaries (thereby saving on employee costs and reducing federal taxes paid); (ii) falsification of jobs and work for which visas are sought; and (iii) applying for L-1 visas for work for which an H-1B visa is required and B-1 visas for work for which an H-1B or L-1 visa is required (thereby reducing the amount paid to the federal government in visa application filing fees).

<u>Id.</u> at 17, ¶64.

1. *Underpayment of H1-B Workers*

Plaintiffs allege that HCL falsifies prevailing wage applications for H1-B visa applications. <u>See generally</u> Doc. #48 at ¶¶65-78.

"[T]o obtain an H1-B visa, HCL must certify to the government that, once an H1-B visa holder is in the United States, HCL will pay the employee at least as much as it pays

6

local hires performing the same work in the same geography." Id.
at 18, ¶65. Despite that certification, HCL pays its H1-B visa
workers up to seventy percent less than it would pay an American
hire. See id. at 19-20, ¶69. "[W]hile HCL knows that it
underpays its H1-B visa workers in violation of U.S. visa laws,
this practice is the norm within HCL." Id. at 22, ¶73.

"HCL's underpayment of its H1-B visa workers has deprived
the U.S. government of significant tax revenue[]" because "by
failing to pay its H1-B employees the required prevailing wage,
HCL has reduced the amount of federal payroll tax it otherwise
would have been required to pay the federal government." Doc.
#48 at 38, ¶112.

  2.  *Falsification of Jobs and Work*

Plaintiffs next allege that HCL "falsifies jobs (and work)
for which visas are sought[,]" in order "to maximize the number
of visas it applies for and secures, including H1-B and L-1
visas." Id. at 24, ¶79. Plaintiffs allege that HCL identifies
"[f]ake jobs and duties ... in LCAs posted at client sites and
in applications and materials submitted to the government as
evidence that the jobs for which visas are sought actually exist
in the U.S." Id. (footnote omitted). Accordingly, after arrival
in the United States, "H1-B visa holders often perform roles
that do not match the job listed on their LCA and visa petition,

7

given that the jobs for which visas were sought did not actually exist." Id. at 25, ¶81.

"HCL's practice of creating 'visa ready' workers by fraudulently obtaining visas has deprived the government of its interest in the fraudulently-obtained visas and its interest in controlling the distribution of such visas according to law." Id. at 39, ¶114.

### 3. Applying for L-1 and B-1 Visas instead of H1-B Visas

The last theory of fraud alleged by plaintiffs is that, "as part of its 'visa ready' visa process and to reduce visa application fees, HCL fraudulently seeks L-1 and B-1 visas for employees who ultimately perform work for which H1-B visas are required." Doc. #48 at 30, ¶94.

Plaintiffs allege that "HCL is well aware of the cost-savings associated with applying for L-1 visas in lieu of H1-B visas." Id. at 31, ¶98. Plaintiffs allege that HCL "is well aware that this practice is illegal." Id. at 34, ¶102. Nevertheless, "HCL misuses B-1 visas to evade the requirements, costs, limitations, scrutiny, and inconvenience of the H1-B and L-1 visa programs[,]" and to "increase[] its profits[.]" Id. at 35, ¶¶104-05.

"HCL has improperly applied for thousands" of L-1 and B-1 visas in lieu of H1-B visas, which has deprived the federal government of "significant visa application revenue[.]" Id. at 38-39, ¶113.

## II.   PLEADING STANDARDS ON MOTION TO DISMISS

HCL asserts two procedurally separate grounds for dismissal. First, HCL asserts that the 4th AC fails to state a claim for which relief may be granted pursuant to Rule 12(b)(6). See Doc. #53 at 7. Second, HCL asserts that the 4th AC fails to plead fraud with particularity as required by Rule 9(a). See id. at 8.

"Qui tam complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)." United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc., 865 F.3d 71, 81 (2d Cir. 2017). However, because the Court does not reach defendants' Rule 9(b) arguments, the Court addresses herein only the pleading requirements under Rule 12(b)(6).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted); accord Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854

(2d Cir. 2021). In reviewing such a motion, the Court "must accept as true all nonconclusory factual allegations in the complaint and draw all reasonable inferences in the Plaintiffs' favor." Kaplan, 999 F.3d at 854 (citations omitted). "In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010).

"[W]hile this plausibility pleading standard is forgiving, it is not toothless. It does not require [the Court] to credit legal conclusions couched as factual allegations or naked assertions devoid of further factual enhancement." Mandala v. NTT Data, Inc., 975 F.3d 202, 207 (2d Cir. 2020) (citation and quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." Iqbal, 556 U.S. at 678 (citations and quotation marks omitted).

## III. DISCUSSION

"The FCA facilitates restitution to the federal government when money is fraudulently taken from it." U.S. ex rel. Bilotta v. Novartis Pharms. Corp., 50 F. Supp. 3d 497, 508 (S.D.N.Y.

2014). "A person[,]" called a relator, "may bring" a civil <u>qui</u> <u>tam</u> "action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. §3730(b)(1); <u>see</u> <u>also</u> <u>Bilotta</u>, 50 F. Supp. 3d at 508.

Plaintiffs assert both traditional and reverse FCA claims. <u>See generally</u> Doc. #48; <u>see also</u> 31 U.S.C. §§3729(a)(1)(A), (a)(1)(B), (a)(1)(G). Defendants assert that plaintiffs have failed to adequately allege a traditional FCA claim because "the alleged fraud did not result in any **payment** by the U.S. government[]" to HCL. Doc. #53 at 9. Defendants assert that plaintiffs' "reverse FCA claims also fail because: (i) [plaintiffs] fail to allege adequately scienter under a reverse FCA theory, (ii) they have not alleged HCL avoided any legally cognizable obligation to pay the U.S. government, and (iii) the FCA's Tax Bar precludes their claims." <u>Id.</u> at 9. Finally, HCL asserts that the "public disclosure bar" prohibits plaintiffs' claims. <u>Id.</u> at 29.

Plaintiffs contend, <u>inter alia</u>, that: (1) they have adequately alleged a reverse FCA claim under 31 U.S.C. §3729(a)(1)(G), <u>see</u> Doc. #57 at 13; (2) "HCL's fraudulent claims for visas can be considered fraudulent claims for 'property[;]'" <u>id.</u> at 29 (capitalizations altered); and (3) the public disclosure bar does not prohibit their claims, <u>see</u> <u>id.</u> at 34-42.

A.   <u>Traditional FCA Claims</u>

Plaintiffs allege that HCL violated 31 U.S.C. §§3729(a)(1)(A) and (B) by knowingly submitting fraudulent paperwork and applications for H1-B and L-1 visas that deprived the government of its interest in those visas. <u>See</u> Doc. #48 at 39, ¶114; <u>see also</u> <u>id.</u> at 45-46, ¶¶24, 126. Defendants assert that these claims fail as a matter of law because "the U.S. government did not suffer any financial deprivation because of HCL's allegedly fraudulent acts." Doc. #53 at 10 (footnote omitted). Plaintiffs assert that HCL's "fraudulent demands for visas can be considered a false claim under the FCA." Doc. #57 at 29 (footnote omitted).

A relator may bring an action against "any person who ... knowingly presents, or causes to be presented [to the federal government], a false or fraudulent claim for payment or approval[.]" 31 U.S.C. §3729(a)(1)(A); <u>accord</u> <u>U.S. ex rel.</u> <u>Feldman v. van Gorp</u>, 697 F.3d 78, 86 (2d Cir. 2012). A relator also may bring claims against "any person who ... knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. §3729(a)(1)(B). As relevant here, the term "claim" is defined by statute as "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United

States has title to the money or property, that -- is presented to an officer, employee, or agent of the United States[.]" 31 U.S.C. §3729(b)(2)(A)(i). The statute does not define the term "property[.]"

As plaintiffs submit, the "key issue" in their traditional FCA claim "is whether HCL's fraudulent claims for visas can be considered fraudulent claims for 'property.'" Doc. #57 at 29. Defendants respond: "Relators concede every case ... that examined whether visas constitute 'property' sufficient to give rise to an FCA claim has held in the negative, concluding visas are not property[.]" Doc. #63 at 10-11. Accordingly, the Court begins with the question of whether a visa constitutes "property" for purposes of a traditional FCA claim.

Plaintiffs assert that visas are "intangible property" for purposes of the FCA. Doc. #57 at 31. In support of this assertion, plaintiffs attempt to distinguish the Supreme Court decision in Cleveland v. United States, which considered the question of "whether the federal mail fraud statute, 18 U.S.C. §1341, reaches false statements made in an application for a state license." Cleveland, 531 U.S. at 12, 15 (2000); see also Doc. #57 at 30-31. The Supreme Court held in the negative, finding that video poker licenses did not fall within traditional concepts of property rights under the federal mail

fraud statute. See id. at 20. Specifically, and as will be
relevant to plaintiff's argument on this point, the Supreme
Court held that the mail fraud statute "does not reach fraud in
obtaining a state or municipal license of the kind here
involved, for such a license is not 'property' in the government
regulator's hands." Id. In reaching this holding, the Court
noted that it was "beyond genuine dispute" that any interests
the government had in the licenses "are purely regulatory[.]"
Id. at 21-22 (citation and quotation marks omitted).

The government in Cleveland made a similar argument as
plaintiffs do here: that the alleged fraud "frustrated the
state's right to control the issuance, renewal, and revocation
of video poker licenses under" the relevant state statute. Id.
at 23. The Supreme Court rejected that argument, finding that

> these intangible rights of allocation, exclusion, and
> control amount to no more and no less than Louisiana's
> sovereign power to regulate. ... Even when tied to an
> expected stream of revenue, the State's right of control
> does not create a property interest any more than a law
> licensing liquor sales in a State that levies a sales
> tax on liquor.

Cleveland, 531 U.S. at 23.

Courts applying Cleveland to determine whether licenses or
visas constitute "property" in the context of the FCA have
similarly held they do not. For example, in United States v.
Majestic Blue Fisheries, LLC, 196 F. Supp. 3d 436, 445 (D. Del.

2016), the District of Delaware held that a fishing license was not property within the meaning of the FCA because the license "does not exist independent of a regulatory regime." Id. at 445 (citation and quotation marks omitted). The District of New Jersey, applying Cleveland and Majestic Blue to facts nearly identical to those alleged in the 4th AC, held:

> Like a license, a visa has no value to the government beyond the revenue stream from application fees. Rather, "[i]t licenses, subject to certain conditions, engagement in pursuits that private actors may not undertake without official authorization." Cleveland, 531 U.S. at 13. For example, foreign workers may not enter the United States or perform paid services unless they meet specific criteria and comply with immigration regulations, and the United States controls the number of visas and the process by which they are issued. Such a "purely regulatory" scheme does not invoke traditional property rights. Majestic, 196 F. Supp. 3d at 444 (quoting Cleveland, 531 U.S. at 21-22).

Franchitti v. Cognizant Tech. Sols. Corp., 555 F. Supp. 3d 63, 69 (D.N.J. 2021), reconsideration denied sub nom. Franchitti v. Cognizant Tech. Sols., No. 3:17CV06317(PGS)(LHG), 2022 WL 605745 (Mar. 1, 2022). The Court is persuaded by this reasoning.

Plaintiffs acknowledge the persuasiveness of Majestic Blue and Franchitti, but encourage the Court to "not follow" these cases "because they both do not address that the statutory definition of 'claim' under the FCA expressly includes a request for property regardless of whether the government can be considered to have 'title' to such property." Doc. #53 at 31

15

(quoting 31 U.S.C. §3729(b)(2)). Rather, plaintiffs contend that "[l]ike in <u>Cleveland</u>, visas constitute intangible property <u>in the visa holder's</u> hands because they provide a legal status granted by the government that allows access to a particular set of economic benefits." Doc. #53 at 31. Accordingly, plaintiffs assert that unlike the mail fraud statute at issue in <u>Cleveland</u>,

> the FCA is clear that a "claim" includes "any request or demand ... for ... property ... <u>whether or not the United States has title to the money or property</u>." 31 U.S.C. §3729(b)(2)(A) (emphasis added). Unlike the mail fraud statute, the FCA not only protects the government's money, but its interest in preventing "fraud [that] erodes [the] public confidence in the government's ability to efficiently and effectively manage its programs." <u>See United States ex rel. Rosales v. San Francisco Hous. Auth.</u>, 173 F. Supp. 2d 987, 1019 (C.D. Ca. 2001)[.]

Doc. #57 at 30.

Plaintiffs mistakenly focus on the issue of title and ignore the core finding of the three previously cited cases, which is that that "a 'purely regulatory' scheme[,]" such as that governing the issuance of visas,[4] "does not invoke

---

[4] <u>See, e.g.</u>, <u>Mutasa v. U.S. Citizenship & Immigr. Servs.</u>, 531 F. Supp. 3d 888, 890 (D.N.J. 2021) ("An overview of the applicable <u>regulatory scheme</u> is helpful. The Immigration and Nationality Act ... creates different employment-based immigration visas." (emphases added)); <u>Texas A&M Univ. - Corpus Christi v. Upchurch</u>, No. 3:03CV00275(BF), 2003 WL 21955866, at *1 (N.D. Tex. July 8, 2003) ("[T]he <u>regulatory scheme</u> for visa applications is highly detailed[.]" (citation and quotation marks omitted) (emphases added)).

traditional property rights." <u>Franchitti</u>, 555 F. Supp. 3d at 69
(quoting <u>Majestic Blue</u>, 196 F. Supp. 3d at 444). Thus, the
plaintiffs' "property claim has a ... major flaw: the FCA is not
a vehicle for punishing garden-variety regulatory violations[,]"
such as those alleged in the 4th AC. <u>United States ex rel.</u>
<u>Kasowitz Benson Torres LLP v. BASF Corp.</u>, 929 F.3d 721, 727–28
(D.C. Cir. 2019) (citation and quotation marks omitted).
Plaintiffs encourage the Court to expand FCA liability to
encompass visas as a form of property. This the Court declines
to do, for reasons substantially similar to the holdings of
<u>Majestic Blue</u> and <u>Franchitti</u>, which the Court finds persuasive
on this issue. "Absent ample evidence of congressional intent,"
which plaintiffs have not provided, the Court "will not
interpret the term property in a way that fundamentally changes
the relationship between the FCA and garden-variety regulatory
violations." <u>Kasowitz</u>, 929 F.3d at 728.

Plaintiffs have "not alleged that defendant[s] made any
false or fraudulent statement which caused the government to pay
money or which allowed defendant[s] to deprive the government of
money owed. Rather, plaintiff[s] claim[] that defendant[s] made
a fraudulent statement to obtain certification for its alien
employee. Such statement is not made in relation to a 'claim' as

defined by the statute[.]" <u>United States v. Richard Dattner Architects</u>, 972 F. Supp. 738, 747 (S.D.N.Y. 1997).

Because a visa does not "exist independent of the regulatory regime[,]" it is not property. <u>Majestic Blue</u>, 196 F. Supp. 3d at 444 (citation and quotation marks omitted); <u>accord Franchitti</u>, 555 F. Supp. 3d at 69. Plaintiffs have therefore failed to adequately allege a claim pursuant to 31 U.S.C. §§3729(a)(1)(A) and (B). Accordingly, all traditional FCA claims asserted pursuant to 31 U.S.C. §§3729(a)(1)(A) and (B) are **DISMISSED.**[5]

    B.   <u>Reverse FCA Claims</u>

Alternatively, plaintiffs allege that defendants violated 31 U.S.C. §3729(a)(1)(G) by: (1) underpaying HCL's workers, thereby depriving the federal government of tax revenue, and (2) knowingly applying for B-1 and L-1 visas instead of H1-B visas, thereby decreasing HCL's financial obligation to the government. <u>See</u> Doc. #48 at 45-46, ¶¶124, 126; <u>see also</u> Doc. #57 at 13-14. Defendants assert that these claims fail because: (1) plaintiffs fail to adequately allege scienter; (2) defendants did not avoid any established obligation to pay money to the federal

_____

[5] In light of this finding, the Court does not reach defendants' argument that plaintiffs "have not alleged HCL made any false statement material to any false or fraudulent claim[]" for purposes of 31 U.S.C. §3729(a)(1)(B). Doc. #53 at 16-17.

18

government; and (3) the FCA's Tax Bar prohibits any tax-related claims. See generally Doc. #53 at 18-29. Plaintiffs contend that they have adequately alleged a reverse FCA claim and that the FCA's Tax Bar does not prohibit that claim. See generally Doc. #57 at 14-22. The Court first considers whether plaintiffs have "allege[d] facts demonstrating that HCL avoided or decreased any established obligation to pay money to the U.S. government." Doc. #53 at 21.

> 1.  Plaintiffs have not alleged facts showing that
>     HCL decreased or avoided an obligation to the
>     United States government.

Defendants assert that plaintiffs' reverse FCA claims "fail as a matter of law because they cannot allege facts demonstrating that HCL avoided or decreased any established obligation to pay any money to the U.S. government." Doc. #53 at 21. Plaintiffs contend that "HCL misconstrues the applicable law and is wrong about its application to Relators' claims." Doc. #57 at 14.

"Subsection (a)(1)(G) is referred to as the reverse false claims provision because it covers claims of money owed to the government, rather than payments made by the government." United States ex rel. Foreman v. AECOM, 19 F.4th 85, 119 (2d Cir. 2021), cert. denied sub nom. U.S. ex rel. Foreman v. AECOM, No. 21-1314, 2022 WL 1295727 (U.S. May 2, 2022); see also United

19

States ex rel. Barrick v. Parker-Migliorini Int'l, LLC, 878 F.3d 1224, 1230 (10th Cir. 2017) ("[T]he reverse-false-claims provision, 31 U.S.C. §3729(a)(1)(G), reverses the typical claim under the False Claims Act: instead of creating liability for wrongfully <u>obtaining</u> money from the government, the reverse-false-claims provision creates liability for wrongfully <u>avoiding</u> payments that should have been made to the government."). Subsection (a)(1)(G) allows a relator to bring claims against any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. §3729(a)(1)(G).[6] This "provision applies whenever a defendant has decreased 'an obligation' to pay the Government." <u>United States ex rel. Grubea v. Rosicki, Rosicki & Assocs., P.C.</u>, 318 F. Supp. 3d 680, 703 (S.D.N.Y. 2018) (quoting <u>United States ex rel. Landis v. Tailwind Sports Corp.</u>, 51 F. Supp. 3d 9, 54 (D.D.C. 2014)).

---

[6] As will be discussed in further detail below, section 3729 defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]" 31 U.S.C. §3729(b)(3).

Whether plaintiffs have sufficiently "asserted reverse false claims depends, in part, on the nature of defendants' obligation to pay the Government — a contingent, speculative, or potential obligation is not actionable." U.S. ex rel. Taylor v. Gabelli, 345 F. Supp. 2d 313, 338 n.141 (S.D.N.Y. 2004). "A duty to pay, ... must be formally established before liability can arise. In other words, there is no liability for obligations to pay that are merely potential or contingent." Grubea, 318 F. Supp. 3d at 703 (citation and quotation marks omitted). Thus, to state a claim for a reverse FCA violation a "[r]elator must allege (1) the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government — a duty to pay money or property." United States ex rel. Yu v. Grifols USA, LLC, No. 1:17CV02226(GHW), 2021 WL 5827047, at *12 (S.D.N.Y. Dec. 8, 2021) (citation and quotation marks omitted).

Two cases have addressed the question of whether a defendant decreased or avoided an "obligation" under alleged "schemes" nearly identical, or at the least similar, to that alleged here. The first case to address the question was Lesnik v. Eisenmann SE, 374 F. Supp. 3d 923 (N.D. Ca. 2019). In Lesnik, the complaint alleged that the defendants would hire foreign nationals to work in the United States "on B-1 visas that are

generally reserved for skilled work, even though [defendants] allegedly knew the workers would actually be performing unskilled construction work." Id. at 934. To obtain the visas, one defendant "allegedly submitted letters to the United States Consulate containing allegedly false statements to obtain B-1 visas[.]" Id. The plaintiffs in Lesnik asserted that the defendants committed a reverse FCA violation "because Defendants falsely obtained cheaper B-1 visas, [and] they avoided an obligation to pay the government the higher fees associated with the more expensive unskilled worker visa." Id. at 939 (citation and quotation marks omitted).

There, like here, defendants argued that plaintiffs failed to allege a reverse FCA claim because defendants were "never under any obligation to pay visa fees associated with" the more expensive "petition-based visas." Id. The Northern District of California agreed, finding that "the obligation to pay the government only arises upon applying for a visa. Thus, Plaintiffs' reverse FCA claim under 31 U.S.C. §3729(a)(1)(G) fails because Plaintiffs have not shown that Moving Defendants applied for a visa that obligated Defendants to pay a higher 'fixed sum that is immediately due.'" Id. at 940. In reaching this conclusion, the Lesnik court reasoned:

> Plaintiffs' allegations that Moving Defendants <u>did not</u> submit a visa application for the petition-based visas form the basis for Plaintiffs' reverse FCA claim. FAC at ¶¶61, 68-69. Thus, there was no <u>obligation</u> to pay the government for a petition-based visa because no visa application for a petition-based visa was ever actually submitted. Even Plaintiffs concede that "[a]n employer is obligated to pay fees <u>when applying</u> for petition based visas." <u>Id.</u> at ¶209 (emphasis added).
>
> As the Ninth Circuit held in <u>Bourseau</u>, "[t]he obligation cannot be merely a <u>potential</u> liability." 531 F.3d at 1169 (emphasis added). However, that is exactly what Plaintiffs are predicating their reverse FCA claim on: a <u>potential</u> liability incurred only if Moving Defendants had applied for the petition-based visas. Moreover, because no petition-based visa application was made, there was no "fixed sum that [was] immediately due," which is a requirement of an obligation pursuant to <u>American Textile Manufacturers</u>. 190 F.3d at 735.

<u>Lesnik</u>, 374 F. Supp. 3d at 940. Defendants rely on this case, among others, in support of dismissal. <u>See</u> Doc. #53 at 22-23.

In the second case to examine this issue, <u>Franchitti</u>, the plaintiff asserted that the defendant, Cognizant, "violated 31 U.S.C. §3729(a)(1)(G) ... when it knowingly applied for B-1 and L-1 visas instead of the more appropriate H1-B visas, thereby decreasing its financial obligation to the government." <u>Franchitti</u>, 555 F. Supp. 3d at 69. Although the <u>Franchitti</u> ruling acknowledged the <u>Lesnik</u> decision, the court relied on the decisions of two other courts to reach a different conclusion. <u>See</u> <u>id.</u> at 70-71. Those decisions, <u>United States v. Pemco Aeroplex, Inc.</u>, 195 F.3d 1234 (11th Cir. 1999), and <u>United</u>

States ex rel. Customs Fraud Investigations, LLC. v. Victaulic Co., 839 F.3d 242 (3d Cir. 2016), "focused on whether the defendant had a contractual, statutory or regulatory obligation[]" when interpreting the term "'obligation' under the FCA[.]" Franchitti, 555 F. Supp. 3d at 70.

Ultimately, relying on both Pemco and Victaulic, the Franchitti court found:

> Just as the defendant in Pemco submitted false records to pay less than the true value of the airplane equipment, Cognizant submitted false statements about the nature of its employees work to pay lower visa application fees. And, like the marking duty in Victaulic, Cognizant's obligation to pay the correct visa application fee accrued upon its submission of the visa application.

Id. at 71 (sic). Based on "[a] plain reading of the statute[,]" Franchitti determined "that Cognizant had an obligation to pay the appropriate fee for the privileges associated with its desired visa." Id. The court "characterized" this "as an 'implied contractual' or 'fee-based relationship' under 31 U.S.C. §3729(b)(3). By paying for L-1 and B-1 visas but directing its employees to perform work that required the more expensive H1-B visa, Cognizant decreased – and made false statements material to – its obligation to pay money to the government under 31 U.S.C. §3729(a)(1)(G)." Id. Plaintiffs rely

on Franchitti, and the cases cited therein, to support the
viability of their reverse FCA claims. See Doc. #57 at 16-20.

Defendants assert that like in Lesnik, the facts of the 4th
AC establish that any underpayment of visa application fees "is
nothing more than speculative" because any "obligation to pay
higher rates for H1-B visas (or L-1s)" is "contingent upon
winning a highly competitive lottery[.]" Doc. #53 at 23.
Plaintiffs, however, assert that the Lesnik decision is flawed
because that case "erroneously relied on" the standard set forth
in Am. Textile Mfrs. Inst., Inc. v. The Ltd., Inc., 190 F.3d 729
(6th Cir. 1999) ("ATMI"), which has since been abrogated by the
2009 amendments to the FCA. Doc. #57 at 18. In ATMI the Sixth
Circuit squarely addressed "the meaning of 'obligation' in" the
prior version of §3729(a)(1)(g). ATMI, 190 F.3d at 734. After
reviewing several cases also confronting this question, as well
as "the statute's text, legislative history, and most reasonable
interpretation[,]" the Sixth Circuit held

> that a reverse false claim action cannot proceed without
> proof that the defendant made a false record or statement
> at a time that the defendant owed to the government an
> obligation sufficiently certain to give rise to an
> action of debt at common law.

Id. at 736.

The 2009 amendments to the FCA added the definition of
"obligation" to the current version of the statute to address

25

"conflicting definitions of the term obligation[]" that had developed among the federal courts. <u>United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.</u>, 843 F.3d 1033, 1037 (5th Cir. 2016) (footnote omitted). To reiterate, the term obligation is now defined as: "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment[.]" 31 U.S.C. §3729(b)(3).

Plaintiffs assert that this definition encompasses both "fixed <u>and contingent</u> duties owed to the Government[.]" Doc. #57 at 15 (citation omitted) (emphases added). Plaintiffs are mistaken.[7] Courts that have addressed this issue have routinely rejected that argument, focusing instead on the word "established" in the definition of obligation. Indeed, the majority of courts to have examined the 2009 amendment to the FCA have found that "[t]he most reasonable interpretation" of the definition of obligation "is that 'established' refers to whether there is <u>any</u> duty to pay, while 'fixed' refers to the

---

[7] Plaintiffs erroneously rely on the Senate Report in support of this position. <u>See</u> Doc. #57 at 15-16. The Senate Report "refers" to "whether an obligation must be for a fixed sum[,]" as being "the issue ... that caused the 'confusion among courts[.]'" <u>Simoneaux</u>, 843 F.3d at 1037.

amount of the duty." Simoneaux, 843 F.3d at 1037; accord Barrick, 878 F.3d at 1230-31 ("For our purposes, 'established' is the key word in this definition. As the Fifth Circuit recently explained, 'established' refers to whether there is any duty to pay[.]" (citation and quotation marks omitted)); see also United States ex rel. Petras v. Simparel, Inc., 857 F.3d 497, 506 (3d Cir. 2017) ("We conclude then that for a reverse FCA claim, the definition of an 'obligation' refers to one existing at the time of the improper conduct to pay the Government funds, the amount of which may not be fixed at the time of the improper conduct." (footnote omitted)); United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp., 285 F. Supp. 3d 44, 53 (D.D.C. 2017) (After examining the "legislative history and case law, "the Court agree[d] with Defendants that an 'obligation' under §3729(a)(1)(G) refers to an established duty to pay that exists at the time of the fraudulent conduct, the amount of which may or may not be specifically known at that time."), aff'd, 929 F.3d 721 (D.C. Cir. 2019).

Thus although the amount owed to the government need not be fixed, "a duty to pay must be formally 'established' before liability can arise under the False Claims Act." Barrick, 878 F.3d at 1231; see also Grubea, 318 F. Supp. 3d at 703.

27

Accordingly, the reasoning of the <u>Lesnik</u> decision is sound, and
supports defendants' argument. <u>See</u> Doc. #67 at 7-8.

The Court is persuaded by the plain language of the
statute, as amended, and by the reasoning in <u>Lesnik</u>. Based on
the facts alleged in the 4th AC, there was no obligation for
defendants to pay the government for a more expensive H1-B visa
because no such application was ever submitted. <u>See Lesnik</u>, 374
F. Supp 3d 923. Indeed, defendants could not submit an H1-B visa
application without first having been selected in the lottery.
Thus, any purported obligation to pay fees was entirely
contingent on the visa lottery process.

Defendants' obligation to pay the government arose only
upon applying for a visa. <u>See id.</u> Accordingly, at the time of
the alleged misconduct, the only "established" obligation was
payment for the visa applications <u>actually submitted</u>. Because
plaintiffs allege that defendants paid those fees, plaintiffs
have not alleged that defendants decreased or avoided any
established obligations that were due to the government. In sum,
based on the facts alleged in the 4th AC, there was no
"established duty" for defendants to pay a fee for visa
applications that were never submitted. <u>See Yu</u>, 2021 WL 5827047,
at *12 ("To state a [reverse FCA] claim, [a] Relator must allege
(1) the defendant made a false record or statement (2) at a time

28

that the defendant had a presently-existing obligation to the
government — a duty to pay money or property." (citation and
quotation marks omitted)).

Nor can there be said to be any "established duty" for
defendants to pay federal payroll taxes on higher wages than
defendants actually paid their employees. See 26 U.S.C. §3111(a)
("[T]here is hereby imposed on every employer an excise tax,
with respect to having individuals in his employ, equal to 6.2
percent of the wages ... **paid** by the employer[.]" (emphasis
added)). At the time of the alleged misconduct, defendants did
not have an established obligation to pay higher payroll taxes
because defendants were not paying any wages that supported such
taxes. Accordingly, this reverse FCA theory also fails to state
a claim.

The Court is not persuaded by Franchitti for several
reasons. First, the reasoning and holding of Franchitti take an
incredibly expansive view of the FCA, expanding FCA liability
beyond that contemplated by Congress. See Kane ex rel. U.S. v.
Healthfirst, Inc., 120 F. Supp. 3d 370, 388 (S.D.N.Y. 2015)
("Congress intended for FCA liability to attach in circumstances
where ... there is an established duty to pay money to the
government, even if the precise amount due has yet to be
determined."). As the Supreme Court has said: "The False Claims

29

Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." Universal Health Servs., Inc. v. United States, 579 U.S. 176, 194 (2016) (citation and quotation marks omitted).

Second, a close reading of the cases relied on by Franchitti (and also by plaintiffs) undermines the Franchitti Court's holding on this issue. For example, in Pemco, which was decided in 1999 before the 2009 amendment to the FCA, the Eleventh Circuit determined that "[t]he complaint's allegations ma[d]e clear that" the defendant had decreased its obligation to pay money to the government by misrepresenting the true value of equipment it had purchased from the Air Force. See Pemco, 195 F.3d at 1236-37. There, the defendant had a "pre-existing contractual obligation" to dispose of or return government property that was then in the defendant's possession. Pemco, 195 F.3d at 1237. Thus, the defendant "had a specific legal obligation at th[e] time" it allegedly withheld information from the government. Id. By contrast, here, at the time of the alleged misconduct there was no established legal obligation for defendants to pay higher visa application fees or to pay higher payroll taxes. This is a singularly important distinction because the FCA requires that an obligation be "established" to

trigger reverse FCA liability. <u>See</u> <u>Grubea</u>, 318 F. Supp. 3d
at 703.

_Victaulic_ is similarly distinguishable. There, the
defendant imported "improperly marked pipe fittings without
disclosing that the fittings are improperly marked[,]" which
allowed the defendant to "avoid paying marking duties on these
fittings." <u>Victaulic</u>, 839 F.3d at 246. The "marking duty[] ...
accrued at the time of importation." <u>Id.</u> (footnote omitted). The
Third Circuit accordingly held that defendant was liable under a
reverse FCA theory because defendant had an existing obligation
to pay the marking duty at the time of importation, and it had
knowingly and improperly avoided that obligation. <u>See</u> <u>id.</u> at
254-55. By contrast, here, there was no existing obligation for
defendants to pay a visa application fee for visas for which HCL
never applied. Likewise, defendants were not obligated to pay
taxes on wages they never actually paid their employees. Only <u>if</u>
defendants <u>had</u> applied for the H1-B visa, and only <u>if</u> defendants
<u>had</u> paid higher wages, would there have been any obligation to
pay the higher visa fees or taxes. This type of "contingent,
speculative, or potential obligation is not actionable."
<u>Gabelli</u>, 345 F. Supp. 2d at 338 n.141.

For the reasons stated, the allegations of the 4th AC do
not establish that defendants had any "established duty" at the

time of the alleged misconduct that would support a theory of reverse FCA liability. Accordingly, the Court **DISMISSES** all reverse FCA claims asserted pursuant to 31 U.S.C. §3729(a)(1)(G).

> ## 2.   Tax Bar and Public Disclosure Bar

Because the Court has dismissed plaintiffs' claims, the Court does not reach defendants' remaining arguments in support of dismissal, including those implicating the Tax Bar and the public disclosure bar.

## IV.   CONCLUSION

For the reasons stated, defendants' Motion to Dismiss [**Doc. #52**] is **GRANTED**.[8]

Because any further amendment of the 4th AC would be futile, the 4th AC is **DISMISSED, with prejudice.**

The Clerk of the Court shall close this case.

---

[8] An action brought by a private person pursuant to the FCA "may be dismissed only if the court and the Attorney General give written consent to the dismissal and their reasons for consenting." 31 U.S.C. §3730(b)(1). The Second Circuit, however, "has interpreted this provision to require the Government's consent to dismiss only in cases where the plaintiff wishes to discontinue the action voluntarily, not where the court orders dismissal. Therefore, Government consent to dismiss this action is unnecessary." Richard Dattner Architects, 972 F. Supp. at 747 (citing Minotti v. Lensink, 895 F.2d 100, 103-04 (2d Cir. 1990)).

It is so ordered at Bridgeport, Connecticut, this 28th day of July 2022.

/s/
_____
HON. SARAH A. L. MERRIAM
UNITED STATES DISTRICT JUDGE